IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| SHIRLEY L. SCHEFFER,  )  <br> ) <br> Plaintiff,  ) <br> ) <br> v.  ) <br> ) <br> JO ANNE B. BARNHART,  ) <br> Commissioner of Social Security,  ) <br> ) <br> Defendant.  ) | CIVIL ACTION NO. 2:04cv903-C <br> WO |

**MEMORANDUM OPINION**

**I.  Introduction**

The plaintiff applied for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq., alleging that she was unable to work because of a disability. Her application was denied at the initial administrative level. The plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ"). Following the hearing, the ALJ also denied the claim. The Appeals Council rejected a subsequent request for review. The ALJ's decision consequently became the final decision of the Commissioner of Social Security (Commissioner).[1] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1631(c)(3). Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

this case and ordering the entry of final judgment. Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be reversed and this case remanded for further proceedings.

## II. Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination[2] the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

---

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

[3] *McDaniel v. Bowen,* 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III. The Issues

**A. Introduction.** The plaintiff was 44 years old at the time of the administrative hearing. (R. 284). She has a "ninth grade 'limited' level of education." (R. 14, 286). The plaintiff has no past relevant work experience. (R. 14). Following the administrative hearing, the ALJ concluded that the plaintiff has severe impairments of "bi-polar disorder mixed severe with psychotic features and avoidant personality disorder." (R. 15). Nonetheless, the ALJ concluded that

> it is clear that [Scheffer] has no significant exertional limitations and that she

>is able to perform work activities at all exertional levels. The only limitations of function possessed by the claimant in the present case are slight, non-exertional limitations secondary to her diagnosed bi-polar disorder and avoidant personality disorder. However, considering the totality of the evidence, the undersigned finds that the mild to moderate non-exertional limitations caused by the claimant's mental impairments would not prevent the claimant from performing unskilled work activity on a regular and sustained basis.

(R. 21). The ALJ also concluded that there are a significant number of jobs in the national economy that Scheffer is capable of performing. (R. 22). Consequently, the ALJ concluded that the plaintiff was not disabled. (*Id.*)

**B. Plaintiff's Claims.** The plaintiff presents two issues for the Court's review. As stated by the plaintiff, the issues are as follows.

1.   The Commissioner's decision should be reversed, because it is not supported by substantial evidence in that all of the medical opinions (other than the one time consultative exam by Dr. DeFransico) support the conclusion that Ms. Scheffer is much more limited in work related activities than was articulated by the ALJ in his decision.

2.   The Commissioner's decision should be reversed, because the ALJ failed to give adequate weight to Ms. Scheffer's treating source opinions and did not provide sufficient basis for affording no weight to them as required by the applicable Social Security regulations and the Law of the Eleventh Circuit.

(Pl's Br. at 10).

### IV. Discussion

The plaintiff alleges that the ALJ improperly discounted the opinions of her treating counselor, Annah Courson, her treating psychiatrist, Dr. Faraz Masood, and her treating physician, Dr. Sasikumar Vishwanath while improperly assigning significant weight to the opinion of the consultative examiner. In reviewing the weight assigned by the ALJ to the various physicians and consultative examiner, the court concludes that the ALJ erred as a matter of law.

The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary. *Lewis v. Callahan*, 125 F.3d 1436 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 961-62 (11th Cir. 1985). The Commissioner's regulations confirm the existence of the priority given treating physician opinions:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalizations.

20 CFR § 404.1527(d)(2). It is not only legally relevant but unquestionably logical that the opinions, diagnosis, and medical evidence of a treating physician whose familiarity with the patient's injuries, course of treatment, and responses over a considerable length of time, should be given considerable weight. *Smith v. Schweiker*, 646 F.2d 1075, 1081 (5th Cir. 1981).

An ALJ must clearly articulate the reasons for giving less weight to the opinion of a

treating physician, and the failure to do so is reversible error. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The requisite "good cause" for discounting a treating physician's opinion may exist where the opinion is not supported by the evidence, or where the evidence supports a contrary finding. *See Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). Good cause may also exist where a doctor's opinions are merely conclusory or inconsistent with the doctor's medical records. *See Jones v. Dept. of Health & Human Servs.*, 941 F.2d 1529, 1532-33 (11th Cir. 1991).

In the instant case, the court finds that the ALJ erred when he determined that "good cause" existed to discount the opinions of Dr. Masood, Dr. Vishwanath, and Ms. Courson. The ALJ assigned

> no determinative weight . . . to the opinions of Dr. Masood . . . due primarily to a lack of supporting evidence in the treatment records and a lack of evidence of the existence of an established treatment relationship. . . . Additionally, there is simply no record of how often Dr. Masood saw the claimant during the relevant period under consideration or whether he even performed a psychiatric examination of the claimant during the relevant period at issue.

(R. 17).

The ALJ is simply wrong. It is undisputed that Scheffer has been treated by Dr. Masood at the South Central Alabama Mental Health Center ("South Central") since March 20, 2001. (Doc. # 21, Attached Aff.)[4] On February 28, 2001, Scheffer was referred to South

---

[4] Due to an ambiguity in the record about the plaintiff's treatment history with Dr. Masood, the court ordered the parties to "jointly investigate and determine the author, participants, and events that provide the basis for the information contained on forms dated April 27, 2001, May 18, 2001, June 15, 2001, August 6, 2001, September 10, 2001, October 8, 2001, December 17, 2001, February 18, 2002, March 4, 2002, March 18, 2002, April 22, 2002, May 7, 2002, May 28, 2002, June 10, 2002, July 9, 2002, August 19, 2002, October (continued...)

Central by her family physician, Dr. Vishwanath, for psychiatric counseling. (R. 151). She presented to the Mental Health Center on March 20, 2001. (R. 153, 160). At that time, she reported that she had suicidal and/or homicidal thoughts at least three times a week. She was also sometimes manic and sometimes depressed. (R. 154).

> Shirley is a 41 yr. Caucasian female presenting today w/ the following complaints: racing thoughts, inability to focus, paranoia (always wanting to run away from others as well as self), decreased sleep, nightmares, [decreased] appetite (has lost significant amount of weight to = 30 pds in 6 mos.) [increase] in depression (suicidal ideation but reports no plan). . . . At times she appeared tearful, other times she appeared very anxious. She reports paranoia. She is coming for tx, she is constantly scared therefore she isolates a great deal. Poor relationship w/all family members w/the exception of boyfriend. Abusive relationship hx.

(R. 160). Mental health therapist/counselor Annah Courson ("Courson") noted on a treatment plan that Scheffer was suffering from Bipolar Disorder mixed, severe with psychotic features and Avoidant Personality Disorder.[5] (R. 161).

---

[4](...continued)
7, 2002, October 2, 2003, March 23, 2004. (R. 142 - 150, 190, 193-198, 211, 263, 271)." *See* Doc. # 20.

On June 15, 2005, the parties filed a joint response to the court's order in which the parties agree that

> Ms. Scheffer was treated by Dr. Faraz Masood and he signed the forms in question other than those at TR. 150, 263, and 271. . . [P]sychiatrist sessions are signed by the psychiatrist (in this case Dr. Masood) and are initialed by a therapist (in this case Anna Courson). . . . Dr. Masood also completed a psychiatric residual capacities form. (tr. 254-256). It is apparent that the handwriting and signature of Dr. Masood (which is printed underneath the signature) match the signature of the psychiatric sessions on the dates as mentioned above.
>
> Therefore, it is the agreement of both parties that Dr. Masood was a treating psychiatrist for the above mentioned claimant as evidenced by the records as mentioned above.

(Doc. # 21).

[5] The administrative record provided to the court is missing pages 152 - 159. It appears that these
(continued...)

On May 18, 2001, Scheffer engaged in psychiatric therapy with Dr. Masood. (R. 149). Dr. Masood noted that Scheffer had a history of two prior hospitalizations, her affect was labile and her thought process was abnormal with hallucinations and ideations. (*Id.*) Scheffer's major complaint was "anxiety in and continual avoidance of social interaction and situations." (*Id.*) Dr. Masood continued Scheffer on Prozac[6] and increased her Zyprexia.[7] (*Id.*) Her diagnoses were Bipolar Disorder, mixed severe with psychotic features and Avoidant Personality Disorder. (*Id.*).

Dr. Masood next saw Scheffer on June 15, 2001. (R. 148). At that time, Dr. Masood noted that Scheffer was not depressed but "reports anxiety and agitated impulses in social situations remain the major problem." (*Id.*) Her diagnoses remained the same. (*Id.*)

On August 6, 2001, Scheffer presented to the Mental Health Center complaining of mood fluctuations, social anxiety and an increase in depression. (R. 147). Dr. Masood noted that although Scheffer was complaining of persistent anxiety, her mood and affect were stable. Her perceptual disturbances appeared to be in remission and her depression was responding to medication. (*Id.*) Dr. Masood increased her medications. (*Id.*)

On September 10, 2001, Scheffer appeared at her appointment agitated and depressed. (R. 146). Dr. Masood noted that while her perceptual disturbances were in remission, they

---

[5](...continued)
records relate to Scheffer's initial assessment on March 20, 2001.

[6] Prozac is used to treat depression.

[7] Zyprexia is an anti-psychotic medication used to treat acute mixed or manic episodes of Bi-Polar Disorder as well as Schizophrenia. http://www.rxlist.com

recurred when Scheffer was anxious or under stress. (*Id*.) On October 8, 2001, Scheffer complained of hearing "taunting voices." (R. 145). Dr. Masood continued Scheffer on Zyprexa, Prozac, and Buspar.[8] He increased her Neurontin[9] to 300 mg. while discontinuing her Trazodone medication.[10] (*Id*.)

Scheffer appeared as scheduled for her next appointment on December 17, 2001. (R. 144). At that time, Dr. Masood prescribed Thorazine[11] for Scheffer. He noted no psychotic symptoms. (*Id*.) On February 18, 2002, Scheffer presented to Dr. Masood complaining that she could not afford Thorazine. (R. 143). She reported hearing voices 2 - 3 times a day "making derogatory comments since discontinuation of Zyprexa." (*Id*.) Dr. Masood restarted her on Zyprexa. (*Id.*)

On March 4, 2002, Scheffer reported difficulty with her memory; she felt confused and couldn't follow through on her ideas. (R. 142). Dr. Masood noted some decrease in perceptual disturbances but her paranoia and fearfulness were continuing. (*Id*.) He discontinued her prescription for Zyprexa,[12] Buspar, and Trazodone. He continued her on Prozac and Neurontin and added Thorazine to her medication regime. (*Id*.)

---

[8] Buspar is an anti-anxiety medication.

[9] Neurontin is prescribed for the treatment of seizures and neuralgia.  http://www.rxlist.com

[10] Trazodone is used to treat depression.

[11] Thorazine an anti-psychotic tranquilizer used to treat schizophrenia as well as manic types of manic-depressive illnesses.  http://www.rxlist.com

[12] Scheffer apparently refused to take Zyprexa, complaining that it made her drowsy and 'stoned.' (R. 142).

On April 22, 2002, Scheffer reported to Dr. Masood that she was experiencing auditory hallucinations. (R. 198). Dr. Masood continued Scheffer on Neurontin, Prozac, and Thorazine while adding Risperdal.[13] On May 7, 2002, Dr. Masood noted that Scheffer's auditory hallucinations were continuing. (R. 197). He increased her Risperdal dosage and added Cogentin.[14] On May 28, 2002, Scheffer's auditory hallucinations were continuing but had decreased in frequency. (R. 196). Dr. Masood increased Scheffer's dosage of Thorazine while continuing her on Risperdal, Prozac and Neurontin. (*Id.*)

On June 10, 2002, Scheffer presented to Dr. Masood for a Social Security Assessment. (R. 195). Dr. Masood noted that her condition was stabilized with a significant decrease in her perceptual disturbances. Scheffer reported some drowsiness. (*Id.*) Dr. Masood indicated that he would consider substituting Thorazine for Quetiapine[15] in Scheffer's medication regime. (R. 195). Dr. Masood also completed a mental residual functional capacity assessment. (R. 183-188). Dr. Masood opined that Scheffer had marked limitations in the ability to understand and remember detailed instructions; the ability to work in coordination with or proximity to others without being distracted by them; and the ability to complete a normal workday and workweek without interruption from psychological symptoms and to perform at a consistent pace. (R. 183-184). He further opined that

---

[13] Risperdal is a psychotropic drug used to treat schizophrenia.  http://www.rxlist.com

[14] Congentin is used to treat all forms of Parkinson's disease.  http://www.rxlist.com

[15] Quetiapine is the generic name for Seroquel.  This medication is a pyschotropic drug used to treat acute manic episodes associated with bipolar disorder and schizophrenia.  http://www.rxlist.com

> Pt has a longstanding history of mental evidence [with] evidence of episodic (at times stress related) regressive symptoms [with] marked destabilization and deficits in the ability to perform adequately in the social and occupational setting. Pt. will continue to require medication and psychotherapeutic management on an ongoing basis.

(R. 185). Finally, Dr. Masood noted Scheffer's "decreased ability to respond adequately to work related stresses." (R. 186-187).

On July 9, 2002, Dr. Masood noted that Scheffer was doing well, her mood was stable, and her perceptual disturbances were in remission. (R. 194). Scheffer reported getting married the day before. (*Id.*) Dr. Masood continued Scheffer's current medications and discussed replacing her Thorazine with Seroquel.[16] (R. 194). On August 19, 2002, Dr. Masood noted that Scheffer's marriage was going well but she was experiencing some paranoia about her husband's fidelity. (R. 193). She continued to have "some isolated perceptual disturbances and irritability." (*Id.*) Dr. Masood's treatment plan included tapering Scheffer off Thorazine and tapering her onto Seroquel. He also added Zoloft[17] to her medication regiment. (*Id.*) On October 7, 2002, Scheffer reported an increase in anxiety, frustrations and paranoia as well as a decrease in her ability to sleep. (R. 190). She also reported experiencing hallucinations again. (*Id.*) Dr. Masood noted that Scheffer was dysphoric. (*Id.*). Consequently, Dr. Masood again changed her medication. He tapered her Seroquel to 300 mg., continued her Neurontin, Risperdal, discontinued her Prozac and started

---

[16] Scheffer reported drowsiness from the Thorazine. (R. 194).

[17] Zoloft is an anti-depressant medication used to treat major depressive disorders in adults. http://www.rxlist.com

her on Wellbutrin.[18] (*Id.*) The medical records demonstrate that Scheffer participated in psychiatric therapy sessions with Dr. Masood on at least 15 occasions over a 17 month period from May 18, 2001 until October 7, 2002.

On June 3, 2003, Dr. Masood rated Scheffer's "current psychiatric/psychological impairment." (R. 254-256). He concluded she had marked limitations in her ability to interact appropriately with the public; her ability to get along with co-workers or peers; her ability to understand, remember and carry out complex instructions; her ability to maintain attention and concentration for extended periods of time; her ability to complete a normal workday and workweek without interruption form psychological symptoms and in her ability to perform at a consistent pace. (R. 245-255). He opined that she had a "longstanding history of symptom recurrence under stressful circumstances." (R. 256).

Scheffer continues to be treated at South Alabama Mental Health Clinic. (R. 233-247). On March 23, 2004, she participated in a therapy session with a new psychiatrist.[19] She complained of insomnia, mood instability and anger. (R. 271). At that time, the psychiatrist opined that Scheffer's mood was "very labile - unable to work due to mood instability and auditory hallucinations." (R. 271).

The court will not belabor the point that the medical records simply do not support the

---

[18] Wellbutrin is an anti-depressant medication, used to treat major depressive disorders. http://www.rxlist.com

[19] It is apparent from the handwriting that the psychiatrist who performed the physician assessment is not Dr. Masood. (R. 271). In addition, the parties agree that Dr. Masood no longer works at South Alabama Mental Health. (Doc. # 21).

ALJ's conclusions regarding Dr. Masood.  Furthermore, the ALJ's error in rejecting this evidence is compounded because the ALJ substitutes his opinions for that of the treating psychiatrist.  While the ALJ is entitled to make credibility determinations, the ALJ may not substitute his judgment for the judgments of experts in their field of expertise.  Psychiatrists deal with quintessentially subjective information with respect to which they must exercise professional, interpretive judgment.  Substantial evidence does not support the ALJ's rejection of the opinions of Dr. Masood.  Consequently, the court concludes that the ALJ erred as a matter of law when he discounted Dr. Masood's opinions.

The ALJ also assigned no evidentiary weight to the opinions of Scheffer's family physician, Dr. Sasikumar Vishwanath, in part because there is "no evidence that he is qualified to provide opinions regarding the claimant's mental capacities and limitations." (R. 17).  First, there is no legal requirement that allows only mental health professionals to provide an opinion about a claimant's mental impairment.  In other words, whether a person has psychological abnormalities is not dependent upon recognition only by a psychological or psychiatric expert.  Indeed, the ALJ's conclusion is tantamount to him substituting his opinion for that of Scheffer's treating physician.

In addition, the ALJ discounted Dr. Vishwanath's opinions because "the record contains no evidence of a longitudinal relationship between Dr. Vishwanath and the claimant." (R. 17).  The medical evidence demonstrates that Scheffer has been treated by Dr. Vishwanath since January 1998. (R. 141).  On January 2, 1998, Scheffer presented to Dr. Vishwanath complaining about high blood pressure. (*Id.*) Dr. Vishwanath diagnosed her

as suffering from hypertension and hypertensive heart disease. (*Id*.) Scheffer presented to Dr. Vishwanath for a follow-up visit on April 16, 1008. (R. 140). On November 23, 1998, Scheffer presented to Dr. Vishwanath complaining of left ear pain. (R. 139). Scheffer was seen by Dr. Vishwanath on November 23, 1998 and December 29, 1998. (R. 138). On January 4, 1999, Dr. Vishwanath diagnosed Scheffer as suffering from antral gastritis, hiatal hernia, and epigastric pain. (R. 137)

Dr. Vishwanath saw Scheffer several times in 2000, and, on January 8, 2001, Dr. Vishwanath prescribed Elavil[20] for Scheffer because she was "feeling very stressed." (R. 136). He opined that she had symptoms of depression. (R. 133). On February 12, 2001, Scheffer discussed her feelings of being scared around people and possible depression. (R. 132). Dr. Vishwanath noted that she "continues to have symptoms of anxiety and social phobias. (R. 262). He diagnosed her as suffering from social phobia/anxiety and hypertension. (R. 262). He prescribed Paxil,[21] increased her dosage of Elavil, and referred her to the mental health clinic. (132, 262).

On May 24, 2001, Dr. Vishwanath noted that Scheffer was prescribed Zyprexa by Dr. Guginewi from the Mental Health Center in Andalusia. (R. 131). She was taken off the Paxil and she stopped taking the Elavil because it caused constipation. (*Id*.) Her depression seemed improved. (*Id.*) On September 9, 2001, Scheffer presented to Dr. Vishwanath for a follow-up visit. At that time, he noted that she was taking Prozac, Buspar, Zyprexa, and

---

[20] Elavil is used to treat depression.  http://www.rxlist.com

[21] Paxil is used to treat major depressive disorders.  http://www.rxlist.com

Thorazine. (*Id*.)

On January 23, 2003, Dr. Vishwanath submitted a letter to the ALJ describing Scheffer's treatment history with him.

> Please be advised that [Scheffer] has been under my care since 1-2-98 and was last seen in this office on 1-22-03. Patient suffers from Hypertension, hiatal hernia, severe anxiety, avoidant personality disorder and Bi-polar disorder. Patient is currently on Neurontin 300 mg x 6, Risperdal 3 mg x 2, Seroquel 100 mg x 6, Diovan 1 daily and Inderal 1 daily. Patient will require at least monthly monitoring of symptoms and medications.

(R. 214).

Again, the medical records simply do not support the ALJ's conclusion that Dr. Vishwanath did not have a longitudinal relationship with Scheffer. In fact, that conclusion is contrary to the evidence. Consequently, the court concludes that the ALJ's reasons for discounting the opinions of Dr. Vishwanath are not supported by substantial evidence.

Because the court concludes that the ALJ erred as a matter of law, and that this case is due to be remanded for further proceedings, the court declines to engage in a lengthy discussion of the ALJ's treatment of Courson's opinions. The ALJ conceded, as he must, that, under the Commissioner's own regulations, Courson qualifies as a treating source.[22] (R. 16). Consequently, the court concludes that the ALJ's failure to give any weight to Courson's opinion simply because she "lacks a credible medical or evidentiary basis for the harsh limitations she assigned to the claimant" is not supported by the evidence.

Finally, the ALJ compounded the errors in this case by then giving significant weight

---

[22] 20 C.F.R. §404.1514(d)(1) describes therapists as medical sources.

to Dr. DeFransico's findings from his consultative evaluations of the plaintiff. The ALJ assigned significant weight to Dr. DeFransico's opinion because he concluded that Dr. DeFransico's opinion was consistent with the findings of the non-examining consultant. (R. 19). The opinion of a non-examining physician is entitled to little weight. *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990). Moreover, in this circuit, the reports of reviewing non- examining physicians do not constitute substantial evidence on which to base an administrative decision if they are inconsistent with or contradicts the opinions of treating physicians. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). Because the court concludes that the ALJ failed to properly consider the opinions of the plaintiff's treating psychiatrist and physician, doubt is necessarily cast upon the ALJ's reliance on the opinions of the consultative and non-examining sources.

## V. CONCLUSION

Accordingly, for the reasons as stated, this case will be reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

A separate order will be entered.

Done this 30th day of June, 2005.

                                            /s/Charles S. Coody
                                    CHARLES S. COODY
                                    CHIEF UNITED STATES MAGISTRATE JUDGE